MORGAN SASH & DOOR CO. v. CULLEN LBR. CO.

No. 31706. May 22, 1945.

*159 P. 2d 233.*

Mastin Geschwind and Eagin & Eagin, all of Oklahoma City, for plaintiff in error.

Rittenhouse, Webster, Hanson & Rittenhouse, of Oklahoma City, for defendant in error.

RILEY, J. This is an appeal from a judgment in favor of defendant in error, herein referred to as defendant, on its answer and cross-petition in two cases consolidated in the district court.

Plaintiff in error, herein referred to as plaintiff, on October 28, 1942, sued defendant in justice of the peace court to recover $53.87, the alleged purchase price of certain materials sold by plaintiff to defendant during September, 1942, consisting of different types of millwork such as sash, doors, and other finished and semi-finished products suitable for use in the construction of buildings and usually handled and sold by retail lumber dealers. Defendant answered the bill of particulars admitting the purchase of the goods, but alleging the purchase price to be $48.49 instead of $53.87, in that plaintiff had refused to allow a customary and agreed discount on the price of the goods, which plaintiff had allowed for similar goods during the month of March, 1942; that the refusal of the discount was in violation of the Emergency Price Control Act and regulations thereunder. By way of offset and counterclaim, defendant sought recovery from plaintiff of $50, the minimum amount specified in said act, as recovery for such violation, and a reasonable attorney's fee in the sum of $25. Judgment in the justice of the peace court was for plaintiff, and defendant appealed to the district court.

December 7, 1942, plaintiff sued defendant in the district court of Oklahoma county to recover $321.46, the alleged purchase price of similar goods sold by plaintiff to defendant during August, 1942. Plaintiff alleged that the sale price of the goods sold during said month was $323.70 but allowed credit of $2.24 for goods purchased by plaintiff from defendant.

Defendant answered in that action admitting the purchase of the materials and alleging that the same were used in the construction of certain buildings, and alleged that the proper price chargeable was only $291.33 because during March, 1942, plaintiff had an established custom and specific agreement with defendant allowing a discount of 10% from the list price and that withdrawal or disallowance of said discount by plaintiff was in violation of the Emergency Price Control Act and the regulations thereunder, and by way of offset and counterclaim, defendant sought reduction of plaintiff's claim in the sum of $99.11, being three times the amount of alleged overcharge, and for an attorney's fee in the sum of $100.

As a further offset or counterclaim, defendant sought additional reduction of plaintiff's claim in the sum of $99.66 by reason of alleged profits it would have made on certain materials sold by plaintiff to certain of defendant's customers at retail, in violation of an adopted policy and custom under which

plaintiff had refrained from selling such materials to consumers at retail. Reply was by general denial of new matter and specific denial of all allegations of the answer charging plaintiff with violation of the Emergency Price Control Act. The two cases were consolidated and treated as separate causes of action.

Trial was to a jury. The trial court withdrew from the jury the claim of defendant based upon sale of goods at retail by plaintiff to defendant's customers. Verdict and judgment were for plaintiff in the sum of $262.73, being the amount sued for less three times the alleged overcharge of 10%. By agreement, the amount of attorney's fee was left to the court, which was later fixed at $50, the net judgment being for $212.73, and all costs were taxed against the plaintiff.

Plaintiff appeals and assigns numerous alleged errors. The fourth, fifth, and seventh assignments may be considered together. They are that the verdict and judgment are not sustained by sufficient evidence, are contrary to and not authorized by the law, and that the court erred in overruling plaintiff's demurrer to defendant's evidence, and refusing to direct a verdict for plaintiff for the whole amount sued for. Plaintiff contends that under the uncontradicted evidence, defendant is not entitled to maintain its action on its offset or counterclaim under section 205 (e) of the Emergency Price Control Act, 1942, in that the evidence shows conclusively that defendant did not purchase the material in question for use or consumption other than in the course of trade or business.

Section 205(e) of the Emergency Price Control Act provides:

"Sec. 205(e) If any person selling a commodity violates a regulation, order or price schedule prescribing a maximum price or maximum prices, the person who buys such commodity for use or consumption other than in the course of trade or business may bring an action either for $50 or for treble the amount by which the consideration exceeded the applicable maximum price, whichever is the greater, plus reasonable attorney's fees and costs as determined by the court. . . . If any person selling a commodity violates a regulation, order, or price schedule prescribing a maximum price or maximum prices, and the buyer is not entitled to bring suit or action under this subsection, the Administrator may bring such action under this subsection on behalf of the United States."

Defendant in its answer admitted that it purchased the material from defendant and alleged "that said materials so purchased and furnished were used by the defendant in the construction of certain buildings . . . ." Thereby defendant based its right to maintain its offset or counterclaim on the provisions of said section.

The evidence shows that at the time the materials were purchased by defendant, it was the owner of a number of lots in Oklahoma City upon which it was having buildings constructed. Defendant's witness, H. P. Cullen, testified that he was vice president and manager of defendant company. He identified the lots upon which defendant was having the buildings constructed. With reference to the purchase and use of the materials in question, he testified:

"Q. I will ask you can you state whether or not it went direct to stock put in your stock to use in your trade? A. We ordered some stuff that was put in stock, later went on jobs, and it might have been for resale. . . . Q. These lots you testified were owned by the Cullen Lumber Company in Douglas Place, is the Cullen Lumber Company the party that erected those buildings out there? A. We didn't go out and do the carpenter work, no, sir. Q. You sell your material to contractors, don't you? A. We sell our materials to contractors, sometimes we use some of it ourselves. Q. Just take the one building, 810 West 48th street, who was the contractor on that job? A. Mr. Lyons. Q. When you delivered these goods out there, after picking them up from Morgan Sash & Door Company, to what account did you charge it on the Cullen Lumber Company books? A. We always have to have some account to charge it to, and charged it to Mr. Lyons, just as a matter of record. Q. Did you charge it at the

same price as charged you by the Morgan Sash & Door Company? A. No, sir; charged it at a profit on them. We tried to figure in something to take care of the overhead expenses and one thing and another. Q. What about 808 West 48th street? A. That was the same thing. Q. He was your customer? A. Yes, sir. Q. 822 West 48th street, who built that house? A. He constructed all of those houses out there. Q. And all of the goods were charged to him at a profit by Cullen Lumber Company over the price the Morgan Sash & Door Company charged the Cullen Lumber Company, is that right? A. Well, it was put on the books that way, yes, sir. Q. Was it collected that way? A. Well, I suppose it was. Q. What about 814 West 48th street? A. The same thing. Q. And 844 West 48th street? A. Those houses were all built at the same time, all built by Mr. Lyons."

Walter J. Reeves, another witness for defendant, who is secretary of the company, testified:

"Q. These houses being built in Douglas Place, were houses that were being built by Mr. Lyons? A. Yes, sir. Q. And that material was charged to Lyons on your books? A. Yes, sir. Q. At prices higher than charged you? A. Yes, sir. Q. And you made a profit on that transaction? A. Yes, sir. That is, when we sell any house we want to come out even. Q. You expect to make some profit? A. We expect to make some profit somewhere along the line. I say, that is when we sell the house."

The record shows that plaintiff sells its materials mostly at wholesale, to retail dealers, but did sell some at retail or directly to contractors or consumers. Defendant is a retail dealer and also builds and has built houses for sale.

The testimony of defendant's witnesses shows that some part of the materials here involved was bought from plaintiff and placed directly in stock for sale at retail. How much of the material was so used does not appear. The testimony also shows that defendant was having the houses, into which the other materials went, built by one Lyons, a contractor. It is reasonably clear that

Lyons, as contractor, was to furnish the material. Defendant, after buying the material from plaintiff, delivered it to its contractor, Lyons. Defendant then charged the same to the contractor at the full price charged it by plaintiff, plus an additional sum as a profit. Thus the contractor not only reimbursed defendant to the full amount of plaintiff's charge but paid an additional amount which ultimately went to defendant's profit. In other words, the contractor paid defendant its full purchase price plus a profit.

The maximum price regulation which defendant relies upon and charges plaintiff with having violated is that part of section 1499.2 which reads:

"No dealer shall change his customary allowances, discounts or other price differentials unless such change results in a lower price. The 'highest price charged' shall be a price charged during March, 1942, to a purchaser of the same class."

Defendant contends that the change or withdrawal by plaintiff of its customary allowance or discount after August 1, 1942, resulted in a higher rather than a lower price to defendant for the goods purchased. Conceding that plaintiff did violate the regulation, the question then arises: Who is entitled to bring the action provided under section 205(e), supra? Plaintiff contends that unless defendant bought the materials in question for use or consumption other than in the course of trade or business, it is not authorized to maintain its action by way of offset or counterclaim.

Defendant cites section 1499.17 of the regulation, which provides:

"§ 1499.17 Penalties. Persons violating any provision of this General Maximum Price Regulation are subject to the criminal penalties, civil enforcement actions, and suits for treble damages provided for by the Emergency Price Control Act of 1942, and proceedings for the suspension of licenses."

Defendant, in effect, contends that thereunder plaintiff is liable to it for the penalty if it is made to appear that

plaintiff violated the maximum price regulation in any manner, but cites no authority on the question of who is entitled to bring the action.

Plaintiff cites no authority directly in point on the question, but does cite Tropp et al. v. Great Atlantic & Pacific Tea Co., 21 N.J. Misc. 205, 32 Atl. 2d 717, wherein it is said:

"Unless a plaintiff can show that the commodity purchased was for use or consumption, no action can be maintained under the Emergency Price Control Act of 1942."

In Hall (Brown, Administrator) v. Chaltis (D.C.) 31 Atl. 2d 699, it is said:

"We think the punitive feature must be strictly construed and cannot be operative against a defendant unless the statute expressly authorizes it."

We have found no other case from state courts going to the question of who may sue under the provisions of section 205(e), supra. Neither do we find any case in the federal appellate courts going to the question. There are some cases from federal district courts, but they are not in harmony.

In Brown, Price Administrator, v. Click Bros. Lumber Co., 52 Fed Supp. 913, it was held:

"Under Emergency Price Control Act authorizing a 'person who buys such commodity for use or consumption other than in the course of trade or business' to bring an action for $50 or for treble the amount by which consideration exceeded applicable maximum price, right to sue for treble damages against anyone regularly engaged in business who was overcharged, either as producer, wholesaler, or retailer, is exclusively the right of individual or concern having to pay the overcharge, and administrator is limited in his right to bring actions for treble damages to suits against persons not regularly engaged in business."

Under the rule stated in that case, defendant in this action would have the right to sue.

In Bowles, Administrator, v. Chew, 53 Fed. Supp. 787, it was held:

"In the Price Control Act authorizing an action for treble damages by the 'person who buys for use or consumption,' the quoted words mean, in the ordinary sense, the consumer, that is, the general public buying over the counter, for its own use, and as reinforced by the clause 'other than in the course of trade or business,' the act means that ultimate consumers may sue, but that tradesmen dealing between themselves in the course of business may not sue one another."

On the question involved, the two cases are in apparent conflict, but both agree that where the buyer is not authorized to bring the action, the administrator may bring it on behalf of the United States.

We think Bowles v. Chew, supra, construes the law correctly. There the court points out that Congress has said that only the person who buys such commodity "for use or consumption other than in the course of trade or business, may bring the action."

It appears that the purpose for which the commodity is bought or intended to be used governs, rather than whether the purchase is made from one regularly engaged in business.

The reasoning of the court in Bowles v. Chew, supra, appears to be unanswerable. Therein it is said:

"It is not subject to dispute that a 'person who buys . . . for use or consumption,' means, in the ordinary sense, i.e., the consumer, i.e., the general public buying over the counter, for its own use. In order that there might be no doubt that Congress intended this description to be in the ordinary sense, it added the excluding clause: 'other than in the course of trade or business.' Thus the tradesmen, i.e., merchants engaged in business, buying and selling between themselves, were not given the right to sue.

"It is clear to me that what Congress said and meant is that members of the general public who buy commodities, to use or consume themselves, may sue for treble damages, but that tradesmen, who deal and buy and sell between themselves in the course of business, may not sue one another."

As we view the law, it can mean nothing else. There is ample reason for the distinction. If a person buys a commodity from another, for his personal use or consumption, and is overcharged by the seller, whether such seller be producer, manufacturer, wholesaler, or retailer, when the commodity so sold is used or consumed by the buyer, the buyer stands the overcharge. But where a person buys such commodity, not for his own use or consumption, but for the purpose of resale, and does resell it to another at a profit, he has suffered no detriment by the overcharge because he has been reimbursed in full for the rightful sale price, the overcharge, and in addition has made a profit. In such case, the buyer is not authorized to bring the action. Nevertheless, the first seller has violated the law and section 205(e), supra, gives the administrator the right to bring an action for the penalty on behalf of the United States.

Defendant's evidence clearly brings its case within the latter class, and under the act, it was not authorized to maintain its offset or counterclaim.

The plaintiff's demurrer to the defendant's evidence going to its offset or counterclaim should have been sustained, and the court should have directed a verdict for plaintiff for the full amount sued for. Other errors are assigned, but in view of the conclusion we have reached on the above question, it is not necessary to discuss them. The judgment is reversed and the cause is remanded, with directions to enter judgment for the plaintiff.

GIBSON, C.J., HURST, V.C.J., and WELCH, CORN, and DAVISON, JJ., concur. ARNOLD, J., not participating.